THE SINGER COMPANY, Wood Products Div.,
Employer *v.* Joe JOHNSTON, Employee

5-4388                                      421 S. W. 2d 341

Opinion delivered December 11, 1967

*Barrett, Wheatley, Smith & Deacon,* for appellant.

*Frank Lady,* for appellee.

Carleton Harris, Chief Justice. This is a Workmen's Compensation case. Appellee, Joe Johnston, an employee of The Singer Company, Wood Products Division, engaged in common labor, received a compensable injury to the lower back on September 20, 1963. He was paid weekly benefits for temporary total disability from September 21, 1963, through August 7, 1964, and thereafter, was paid an additional sixty-seven and one-half weeks compensation, representing 15% permanent partial disability to the body as a whole. The company took the position that the compensation for the healing period had been paid, and that the 15% permanent partial disability to the body as a whole was a correct rating. Johnston took the position that he was still totally disabled and unable to work, and a hearing was conducted by a referee in March, 1966. In August, 1966, the referee filed an opinion, finding that the healing

period expired on August 7, 1964, with claimant's having a residual disability of 25% to the body as a whole, and directing that Singer pay additional compensation in the total amount of $1,534.95. Claimant appealed to the full commission, and on December 5, 1966, that tribunal found that Johnston had been temporarily totally disabled since September 21, 1963, and that he should return to Dr. Matthew Wood, a Memphis neurosurgeon, for further treatment; that the matter of termination of the healing period and extent of permanent partial disability should be held in abeyance. The company appealed to the Circuit Court, which affirmed the commission, and from the judgment so entered, appellant brings this appeal.

Background of earlier events is accurately set out in the commission's "statement of the case," as follows:

"The record reflects that the claimant sustained a compensable back injury on September 20, 1963, at which time he reported to Dr. Smith's Clinic in Trumann where he was kept in traction for approximately one week. Dr. Smith then referred the claimant to Dr. Matthew W. Wood, a Memphis Neurosurgeon, and Dr. Wood's reports reflect that the claimant reported for evaluation on September 27, 1963, and was admitted to the Baptist Hospital. A pantopaque myelogram was performed which showed a large defect at the L4 level. On October 3, 1963, a large herniated L4 disc was removed on the right. The claimant was subsequently released to convalesce at home. He was seen by Dr. Wood for postoperative visit on November 21, 1963. Again on December 26, 1963, and on the December 26 visit he made complaints of continuing low back pain and was fitted with a lumbosacral support. On January 23, 1964, the claimant returned to Dr. Wood complaining of low back pain and left leg pain, the side opposite the old surgery. He was sent home to return in two months for evaluation. In a report dated April 1, 1964, Dr. Wood stated, 'His present symptomatology on the left I feel

is also related to his injury which caused the herniation on the right. I advised him to re-enter the hospital to have his left sided herniation surgically removed.' Dr. Wood's report of July 3, 1964, reflects that on June 25, 1964, from an objective standpoint the claimant was unchanged. The report of August 4, 1964, reflects that the claimant had complaints in regard to his low back but that he was advised to return to light work which does not involve excessive bending or heavy lifting. The report of September 21, 1964, reflects that the claimant had recovered and his permanent disability in relation to his herniated lumbar disc is 15 per cent.''

Of course, we are only concerned with whether there was substantial evidence to support the findings of the commission, and there is no necessity to review all of the testimony. It appears that prior to working for appellant, Johnston had engaged in hard, manual labor for a number of years, and had had no trouble or difficulty with his back, legs, feet, or neck. After Dr. Wood removed the large herniated L-4 disc, Johnston returned to his home. Thereafter, he continued to complain of low back pain in his legs, and he testified that these complaints were due to his injury because of the time lapse between the injury in September, 1963, and June, 1964, when his records first indicated the other complaints. He did find the swelling in the left ankle, but felt that this was due to an arthritic condition, rather than being connected with the injury, ''although we didn't prove it.'' As previously set out (in the commission's statement of the case), in March of 1964, Dr. Wood had advised Johnston to re-enter the hospital to have a herniated disc removed from the left; however, this operation was not performed, and the doctor did not recall the reason therefor. He said that when he last examined Johnston on August 4, 1964, he did not feel that surgery was advisable with relation to the left-sided herniation. Dr. Wood stated however, that ''these discs go in and out,'' and there was a possibility that it would get worse. The evidence reflected that Wood

had directed a letter to The Singer Company in April, 1964, as follows:

"Gentlemen: Mr. Joe W. Johnston returned to the office on March 30, 1964 and since being seen here last has had continued low back and left leg pain. He now has signs of a herniated disc on the left side at L-4. As you know, he had a herniated L-4 disc surgically removed from the right side in October of 1963 and has done quite well from a symptomatic standpoint on the right. His present symptomatology on the left I feel is also related to his injury which caused the herniation on the right. I advised him to re-enter the hospital to have the left sided herniation surgically removed."

The doctor did not recall that the company authorized that Johnston be admitted to the hospital. He did say that, at the time of appellee's last examination, he felt that Johnston could try "light work," but that he should not work at anything that required bending, lifting, or stooping, and if he were required to stand on his feet all day, "that would work against his back." Dr. Wood was of the opinion that appellee did actually experience the pain that he complained of, and he said that the continued low back pain, going down the left leg into the left foot, was in keeping with his earlier findings of a herniated disc condition on the left side. It was his opinion that, if Johnston were still suffering back and leg pains, claimant should be further evaluated by a neurosurgeon.

Following his last visit to Dr. Wood in August, 1964, Johnston subsequently went to Dr. John T. Gray, an orthopedist at Jonesboro for examination. In a report dated March 5, 1966, Dr. Gray stated:

"Examination reveals this patient is ambulatory with slow, guarded gait and uses a cane to protect his weight from the left lower extremity. He moves about,

undressing and dressing with some difficulty—particularly in unlacing his shoes due to limited motion of the lumbar spine. * * *

"Motions of the lumbar spine are limited approximately 50% in all directions. * * *

"He is unable to do heel and toe gait. He is unable to squat and regain the erect posture. He gets on and off the examination table with considerable difficulty and has obvious pain when he rotates to the side or abdomen.

"There is limitation of motion in both hips, particularly in flexion. He can only flex to 90 degrees and complains bitterly of pain upon any attempt to flex beyond this range.* * *

"Multiple x-ray films were made. AP and lateral views of the lumbar spine reveal some calcification of the intervertebral spaces between D9 and 10 and between D10 and 11 with some definite wedging of the 7th dorsal vertebra. There is also flattening of the normal lordotic curve. There is some minimal osteoarthritic lipping of the lower lumbar vertebrae.

"Oblique views of the cervical spine show some encroachment on the spaces between C3 and 4 and C4 and 5 on the right and to a lesser extent, the 2nd and 3rd on the left. The lateral view of the cervical spine shows normal contour of the vertebrae and fairly normal intervertebral spacing. There is some osteoarthritic lipping of the inferior border and the superior border at the 4th interspace."

Dr. Gray concluded that the patient appeared disabled, and he suggested further tests before making a definite recommendation for surgery.

At the request of the referee, Johnston was referred to Dr. Robert Watson, neurosurgeon of Little Rock. Dr. Watson filed a report and also testified by deposition. Though the doctor did not advise re-exploration of

Johnston's back after viewing the myelographic studies made by Dr. Gray, he did indicate that Gray was possibly in a better position to evaluate than one who only reviews the film of the study:

"Now in answer to your question, what Doctor Gray described was something that he saw, a moving action as he did the myelogram, and of course I did not see what he saw when he did the myelogram. At repeated intervals permanent films are made of the dye in the different positions in the back and these are the films that I saw, the permanent record, not what he visualized as the dye moved, but I saw the photographs that he took, and in the photographs that were furnished me I did not see on the left side what you have just read that he saw in the moving picture."

Dr. Watson felt that claimant had a 25% permanent partial disability to the body as a whole, and that any disability beyond that point was without neurological confirmation; however, he said that, in his opinion, on June 6, 1966 (when an examination was conducted), Johnston was not able to perform what is ordinarily referred to as common ordinary labor.[1] The rating given by Dr. Watson was based on physical disability alone, and did not include any emotional factor, nor did the

---

[1] From Dr. Watson's report:

"On examination, this man moves about as one with very definite low back disability. He carries a cane at all times, and seemingly puts it to good use. All of his movements are made with caution and deliberation and in the examining room, with the cane laid to one side, he still, repeatedly reaches toward a table or chair for some supplemental support. This man professes to be totally unable to walk at all on either his heels or his toes, but he does not have the supportive findings to cause one to feel that he is genuinely unable to do so, and instead, I believe, this so-called inability is a reluctance or fear or limitation of his own thinking rather than to be due to bona fide inability. * * *

"Apparently this man did have an initial injury sometime in 1963, and shortly after that, he did undergo surgery for a lumbar disc lesion, and from the appearance of his x-rays, two spaces were explored. However, despite all of this, his present bona fide neuro-

rating relate in any way to age, education, training or experience of the employee. He found no evidence of disability to the neck or upper extremities. Irrespective of his views relative to permanent disability and his opinion that in time Johnston could improve to the point where he could make a living at some type of common labor, Dr. Watson, when asked, "If you were examining for a company, a firm, or a person, would you recommend that this claimant be hired to do common, ordinary physical labor in the condition that you found him to be in on June 6, 1966?" answered, "No."

We think there was ample testimony to justify the commission in holding that there should be a reevaluation, and in directing further medical treatment, including surgery, if deemed advisable.

Affirmed.

---

logical findings do not substantiate the extreme degree of disability that he professes to have. If such a marked degree of bona fide residual disability were actually present, then there be some reflex changes, some sensory changes, and there should be some evidences of muscle atrophy, but none of these are present. Therefore, I believe that a part of this man's present residual disability is of a bona fide character, and that an additional portion of his supposed disability is actually superimposed emotional overlay on the part of the patient. Already this man has applied for and is now receiving 100 per cent permanent residual disability benefits from the Veteran's Administration. Even if this man did have bona fide need for further surgery and if further surgery were carried out, with what the surgeon and others might think were very gratifying results, even so, I doubt that the patient would ever admit to any gratifying degree of improvement. Instead, I believe the man would always profess to still being 'totally and permanently disabled.'"

The doctor felt that Johnston's feelings were genuine: "I believe it is real to him. We might not want to accept it in our own thinking as being real, but I believe that to the man it is."